Call the case. Case number 10-0010, Bernadette Sexton v. City of Chicago. Please identify yourselves and we'll go from there. Okay. Proceed. May it please the court, Justice House, Justice Smith, Justice Thornton. On July 29, 2009, a jury found the City of Chicago liable for its negligence in providing a preemption system that was supposed to keep vehicles away from the city of Chicago. Tell us first, I'm curious, George Sexton, who did he work for? Is that in the record? It is in the record that he worked for the City of Chicago. I know he worked for the City of Chicago. I mean, the City of Chicago is a pretty big place. He was a union pipefitter, Your Honor. He was a pipefitter, but what agency?  Okay. The preemption system in place at 111th and Marshfield Streets at the time of this occurrence was designed and was supposed to keep vehicles away from the crossing when a train was approaching. Specifically, the system went into preemption to send the lights into a mode whereby vehicles were kept away from the tracks. It's just a stop and go light, right? No, Your Honor. Respectfully, it is not. And that was a bone of contention that I tried to point out to the trial court. The preemption system is triggered by the approach of a train. So there's something in the tracks that signals that light. Absolutely. That is exactly what the preemption system is. It triggers the traffic control signals to go into a mode that is supposed to keep vehicles away from the tracks because of the approach of a train. Now, that preemption system is constructed by whom? By METRA or by the City? The City of Chicago installed, maintained, and operated the system, Your Honor. Was the original construction of that preemption, the preemption device that triggers and delays and takes over control over the ordinary traffic installments at the scene, that's not installed by METRA, that's installed by the City?  Because that still wouldn't necessarily, even if it were installed by METRA, I'm not asking whether the right and left turn signs that would have been in place or don't turn or the blanket signs that would have been in place would have been METRA. That may, I imagine, would still be the City because that's not preemptive. Well, specifically, actually, Your Honor, the system, the preemption system is set forth in the manual and uniform traffic control devices as to what it's supposed to do. And that system, as was unrebutted at trial, is supposed to keep vehicles away from the tracks. For Mr. Sexton, who was proceeding southbound, he was given a green light, in essence, to avoid vehicles. It was supposed to avoid vehicles encountering the track, which would be to his right. He wasn't given anything that would caution him. Absolutely not, Your Honor. He had no warning devices notifying him. Except he probably could hear the bell. There was no evidence whatsoever that he could hear the bell. In fact, the evidence, quite to the contrary, was that every warning device notifying a motorist of a train's approach was for westbound traffic. There was nothing whatsoever that was facing southbound traffic. But he was within 200 feet, was he not, of the METRA track? He was within 200 feet. And the key and the importance of that is that the MUTCD regulations specifically provide that prohibitions to right turns should be provided with a preemption system, as a part of the preemption system. So, in essence, by preempting the light to give a southbound motorist like Mr. Sexton a green light, authorizing, directing, and regulating him to make a right turn when a train is approaching, it created a hazard for him. This system is not just a green light. It is a green light that stays green when a train is approaching. Well, it doesn't matter whether it's green or red because right turns were permitted under either circumstance. It does here, Your Honor, respectfully, because the green light I thought that was a southbound view. Well, the critical issue here, Your Honor, was that Mr. Sexton's preemption system is what guided him. And that preemption system went into effect when a train was approaching. That preemption system directed him to make the right turn without having the prohibition to make a right turn. Well, there was nothing to deter him from making a right turn. Well, in fact, the MUTCD regulation is a bit stronger than that in the language. It says, you shall prohibit all turns toward the tracks. And that's what the evidence. It was unrebutted evidence from the experts that testified, Mr. Lumiere, that there should be a prohibition. And there was no such prohibition. Well, he stopped on the track. Well, he stopped, it appears, on the tracks. What, is there another light on the other side of the? There's nothing in the record to tell us why he stopped. Is there traffic in front of him and then another light? There was no. The only eyewitness who testified to the occurrence was Dr. Batana, who was right behind him traveling with her child. And she testified that I made the exact right turn. I saw the gate come down behind his vehicle. And presumably he was startled. And then this 60-mile-per-hour Metra train came barreling down on him. So the only warning or indication he would have of the approach of this train was upon making this right turn. When he was essentially on the tracks when he makes the right turn. Dr. Batana testified to it. It was unrebutted in that regard. He stops and then he gets struck by the train. He had no opportunity to know of the train's approach as he traveled southbound and the train was to his right and to his rear. The court seemed to base its ruling upon the immunity statute provided at 745 LCS 10 backslash 3-104, in essence stating that there was no duty to place a sign. However, the evidence, as the court acknowledged, supported the verdict. The court ruled that the evidence supported a finding for the plaintiff, but he felt that he minimized it. Counsel, you're not seriously arguing, are you, with what I think I saw in your brief? That you can't provide a judgment notwithstanding the verdict unless it's based on evidence, regardless of the correctness or incorrectness of the law. I really can't believe that you're taking that, that you're seriously making that argument. I think you're trying to corner us into thinking that the law is fixed under law of the case, which I also don't think is your serious argument, because, first of all, it wasn't the final judgment here. Secondly, there was no appeal, and all of the cases that you cite in support of the law of the case has an appellate court ruling on the law first. So I really don't think you want to spend too much time on that, but, of course, it's your argument. You can do as you please. Understood, Your Honor. I think the point we were trying to make is that this very issue of the immunity that would be provided, if any, under 3-104, was litigated by most of the courts. And there were determinations that this was a question of fact to be decided by the jury. That was an appropriate ruling based on the evidence that would come out in trial. And the evidence that came out in trial was that it was this preemption system that was, in effect, that directed Mr. Sessions to the jury. Well, but immunity wasn't raised with this jury, right? So the jury, when it made its findings a fact, was not attempting to disprove it. It was attempting to determine factual support for immunity. Well, the jury was being asked to decide questions of fact that I respectfully believe have bearing on immunity, meaning whether it was the preemption system that directed him toward the track. And if they did, the question then becomes, did they provide any support for that conclusion? And if the court should interpret the law, the question of immunity, which is a question of law, to be totally oblique to the evidence, you're not going to be urging, are you, that nevertheless, the court cannot, was precluded from entering a judgment in OV? My argument in that regard is specific to this case because it's dependent upon the facts here, Your Honor. The trial court's ruling in finding that 3-104 immunity applied, in essence, suggests that you could have a blank-out sign in absence of a preemption system, which cannot exist. A blank-out sign is triggered only in the event that a train is approaching. So to minimize the evidence in this case to suggest that it was about not placing a blank-out sign is to ignore the essence and function and role of a preemption system. The preemption system is guiding and restricting, is supposed to restrict traffic toward the tracks. However, it did not do that for southbound, right-turning traffic, which had no warning and no notice whatsoever of the approach of a train because it's from its rear and there's no signage. I believe the trial court relied, in part, on this West case where there was a lawsuit over the failure of the county to install a left-turn exit. And I think the trial court relied on this West case where there was a lawsuit over the failure of the county to install a left-turn exit. And I think the trial court relied on this West case where there was a lawsuit over the failure of the county to install a left-turn exit. The West case is highly distinguishable. In the West case, there was a northbound plaintiff who attempted to make a left turn and was involved in a collision and alleged that there should have been a left-turn signal because there was one in the opposite direction. And the West court ruled there was no duty to make a left-turn signal. And the West court ruled there was no duty to make a left-turn signal. And the West court ruled there was no duty to initially place that signal. That is the oldest of the cases cited, meaning we cite the Schneider case subsequent to that, the Lococo case subsequent to that, and the Judge case subsequent to that. You're making an argument, I think it came out of Schneider, where they take the MTCD and get to that step. And what I'm trying to get in my mind is when a jury takes a case that might be dismissed for tort immunity, but then a jury takes it a step further and says, well, we're going to do that. We're going to go a step further by saying that the preemption system is there and that the city didn't operate and properly maintain it. And then our jury takes the MTCD, which in our case they obviously didn't, after on notice, follow. My question is, can a judge, and I'm having difficulty with this, can a judge raise the tort immunities once it's beyond what Schneider appears to say, where you've gotten to step two, that being that the operation was in effect, so now it's a factual situation. And once it became a factual situation, haven't we gotten beyond that? Respectfully, that's the argument that we're making there. Yeah, but how can you make that argument in the face of the fact that Schneider was under 3201 rather than 304, which looked to the dichotomy between discretionary and ministerial acts, while what we're talking about is initial placement immunity, which is kind of absolute and categorical. And so we have to look at that. But Schneider doesn't address that. But the reason Schneider doesn't address that is because the Schneider court focused on the system that was in existence and recognized that that system was an improper placement, which is no different here. Our case focused on the preemption system that was in existence and operation. In the Schneider case, the issue the sign on the wrong side of the street and too close. Instead of 475 feet away from the curb and instead of placing it on the side where the curb presented the danger, they did it on the other side, which is a supplemental right that they have, but the initial requirement they passed. So they already had the control in place, but negligently placed it on the wrong side of the street. So evidently, although Schneider doesn't discuss this, this is all inferential, Schneider talks only about 201. Why doesn't it talk about 304? Well, one can think of reasons. If we're going to assume that they were aware of 304, which probably they were probably aware, it's probably because the question of initial placement is much weaker in Schneider, since they already had the control in place. But, Your Honor, I agree with you. The fact that a system was placed to control traffic is what was relevant. Presumably the argument, it's a ridiculous argument to say that there was no initial placement on the right-hand side of the street, which is in essence what they're saying here. They looked at a partial system in Schneider, meaning there was a supplemental placement, but not the original sign that should have been on the right-hand side of the street, and the court ruled that the MUTCD controlled what they should do. Well, the fact of the matter is that the placement here, in this case, was, there is nothing in the record that tells us that it was changed by the preemptive placement as opposed to having been original traffic controls that were already there before the preemption. Was the preemption installed? Yeah, before the preemption was installed. Well, the fact, no, the preemption system is what's at issue here. So it's in essence, whether you view it as an incomplete preemption system because it didn't restrict right turns, but the preemption system is exactly the system that caused this problem. It's exactly the system that caused this problem. It did not prohibit right turns. Right turns could be prohibited in any number of ways, a variety of ways, from putting an officer out there to placing some type of a sign, but to have a partial system that is meant to restrict traffic toward the tracks and allows right-turning southbound traffic to go toward the tracks creates the hazard. I would point to the Snyder case and the judge case in particular. The judge case talked about the markings on the roadway. The broken yellow line. Correct. And it talked about the broken yellow lines being a traffic control device and there was no solid yellow line. Arguably, under the defense position in this case, you could say they never placed a solid yellow line, therefore, there was no restriction. But the judge court, looking at Snyder. But they did place a device in the judge case on the street, a controlling device in the form of the broken yellow line, which was erroneously placed because there should have been no broken line, just the yellow line, which would have prohibited passing on either side. But the important thing about the judge case, Your Honor, is it talks about what was in place, meaning the fact that there was a broken yellow line instructed traffic on what they could do, which was pass. But in this particular case, there was nothing. But that's. They had the red light there. They had the stop lights there at the beginning. But there was a preemption. There was a preemption system that gave this man a green light to turn right when the system knew a train was approaching. Well, here's maybe where I'll repeat. Maybe you weren't off the mark in rejecting my softball. Because in point of fact, the right turn could have been made on green or yellow. On green or red, rather. So it wasn't that they placed a green light to invite him to make the turn. But they left that traffic sign the way it was in its pristine form. But, Your Honor, respectfully, that ignores what preemption is. The evidence was that preemption is specifically triggered when a train is approaching. So this man has no knowledge a train is approaching. So a turn on a green, a yellow, or a red is not hazardous to him. But it's not like painting in a broken yellow line, which wasn't there before, but was in a feeble attempt to conform with the manual when it didn't really conform. But it's more egregious, Your Honor, because this is a system that is triggered when a train is approaching, a life-threatening train. But counsel, counsel, with all due deference, and this isn't the end of the story by any means. With all due deference, the key factor that we have to confront under 304 is the word initial. Correct. And that's what I'm addressing. Was this a failure to place an initial device? I understood, Your Honor. And you're trying now to link it with the entire system by saying since the entire system was there with deficits, that those deficits aren't the initial device. And I grant you that judge presents problems, but not particularly that one. Your Honor, if you view, when I refer to the system, I'm not speaking of traffic control, lights, red, yellow, green. I'm speaking of this preemption system. That was in place and in operation at the time this man encountered the intersection. But his question is, was that preemption added subsequent to the basic light? That's what he's trying to find out. The preemption system. In other words, was it later added, which would then fit with Schneider in some of these cases? It was in 94 is when it was added. So you had a basic light there at one time. And then sometime subsequent, 94, this system was put in to rectify the condition that existed. The evidence is that in 94 is when the preemption system was installed, yes. Your Honor, I did want to reserve some time for rebuttal. Any other questions? Okay. How much time will I have for rebuttal? Well, you have at least five, ten minutes. Okay. In conclusion, Your Honor, the issue of what system was in place and critical here. There was a preemption system in place that gave this gentleman a green light when a train was approaching. That created a hazard. The standard of care as dictated by the MUTCD and common law is that once you take the step to improve the intersection, you have to do so on a non-negative inspection. What was missing here were, what was in place here was not enough. There should have been other control devices in place. Either the blanket light, signage, combinations of both, or what? Those items were never installed. So the failure here, if one wants to argue for the city, and I'll have something to say to the city when they come up with this. One can argue that this was not, this was a failure to make initial installations. Except that, Your Honor, it's no different than in Judge where they talk about the failure to place. In Judge, there was a failure to place a solid yellow line. There was a yellow line with a sign, broken line, that shouldn't have been there. They did place the broken yellow line. And that's where they were negligent, and that's what contributed to the accident. And Judge makes a point of emphasizing that. The Judge Court also indicates there should have been a solid yellow line with it so that there was passing on one decision after the other. But it wasn't an omission. It was a commission. They did place a device there, but a wrong device, a negligently placed device, that helped cause the occurrence. And what I'm suggesting to this Court is that the placement of the preemption system was the placement of a device and system to control the situation. But the preemption system was not erroneous or negligent. The negligence wasn't the failure to complete it. But, Your Honor, respectfully, what the case law says is that when you place a system that in its function creates a hazard, you can be held liable. A municipality can be held liable. And that's exactly what happened here. This system created the hazard. It gave him authorization to make a right. Now you're piecemealing Judge. Judge does make statements of that sort. But you can't, I don't think, easily take those statements out of context. Because Judge starts with the fact that you have the wrong, don't worry about the clock. We're, I think, our presiding justice is quite forgiving about that. So. Yeah, I made the mistake. When it's my fault anyway. He came in after. When it's my fault anyway. I don't normally hold you to a specific time. So can I direct the Court for a moment to the Lococo case? The Lococo case, which we cite, is a case wherein they placed stop lines but no stop sign. The MUTCD, according to the Court's interpretation, indicated that the MUTCD guides what types of devices are to be placed to instruct a party to stop. And the fact that that system was incomplete, meaning it had stop lines and no stop signs. There is all kind, there are a number of follow-up statements in Judge that are troublesome. Because they are in conflict with West. But you can't start by avoiding the initial factor that what they did place, they did place a device, which they referred, that's how they referred to the broken line, and it was the wrong device. But, Your Honor, respect. And everything else that follows in terms of hazard and in terms of not following the manual, they're follow-ups. They're afterthoughts. If I could suggest some analogies, Your Honor. If they placed, for instance, a red light, a green light and yellow light with no red, the city clearly could be held liable for an accident which occurred at an intersection because that system is not, to the extent that system contributes to a collision. This system is no different. They preempt, they place a system that guides traffic when a train is approaching. When a train is approaching from a location they know a motorist will not observe it and is at his rear. And they are instructed by the MUTCD about what to do when such a crossing is in such close proximity. And it doesn't say specifically place a sign. It says prohibit turns toward the tracks. The significance of the manual is at its peak in Snyder where you're dealing with a question of whether it's discretionary or ministerial. And in Snyder the court says if you are duty-bound by statute to follow the blueprints of the manual, then it becomes ministerial. But we're not involved in that dichotomy at all. We're involved with 304 which is an absolute immunity that isn't broken up along the discretionary ministerial division. But respectfully to accept that would mean that it would be acceptable to place a partial system. What the case law says is Well, sure it would be according to at least if all we had was Kirkham. Well, Snyder But Snyder doesn't deal with that. Snyder deals with 201, not with 304. But if we just had Kirkham, we would say placing an incomplete unit there still grants immunity. There might be a breach of duty, but the immunity is absolute for any failure to make initial placement. Now the question is what's left of that after judge? That's a whole other question. Okay. Respectfully, if I could point out the distinction in West as Justice House asked. In West, the plaintiff argued that there was an absence of a left turn sign in his direction. That sign is not triggered by any other component of that system which is different than preemption. Preemption specifically triggers this traffic control device when a train is approaching. It changes the sequence when a train is approaching in an effort to prohibit vehicles from reaching the tracks. However, what it does is it guided Mr. Sexton toward the track. Exactly the opposite of what It didn't guide him towards the track. It didn't guide him away from the track. He just had ordinary stoplights at that intersection. He could have gone straight. He could have turned left. He could have reversed. But he chose to make a right turn when, in fact, there was probably a duty, if we look at the case law, to warn him away from it. But just because there was a duty doesn't mean there was no immunity. Except when they install the system, then they have a duty to exercise reasonable care, which means compliance with the MUTCD. You'd like that. But the question, the cases are far more enigmatic than that in that turn of events. Your Honor, respectfully, to view this factual scenario in the way in which it would fall outside of what I just described would mean that you have a no right turn prohibition sign acting independently. That sign in and of itself does nothing. It does absolutely nothing. If you put that sign up there without preemption, it will not activate. It will do nothing. The preemption system is what sends the signals to the traffic control devices to activate it. So to suggest that this is an initial placement ignores the reality that the sign does nothing. It's a failure to make an initial place. But the initial placement is the preemption system, not the sign, because the sign can't operate on its own. It can't function independently. Well, that's the question. That was the evidence. There was undisputed evidence that the preemption system is what operates the traffic control devices when a train approaches. The question is when there is a partial system, whether the failure to make a complete system, whether that still refers back to a lack of an initial placement or whether that's considered maintenance or something else. I would point to Lococo. I would point to the Snyder case. Lococo is also on a discretionary, on a 201 analysis, just as Snyder was. But the reason, Your Honor, if I could just point this out. It doesn't give us as much help as you would like. Except that, Your Honor, if you isolate the system, you could place any scenario under 201 or 304. For instance. It's not me placing them under that scenario. It's the case itself. But respectfully, the city could make the argument in the West case that there was no, I'm sorry, in the Snyder case, that there was no initial placement of a sign on the right-hand side of the roadway. That would be an argument under 304. But it would be harder to make because they already used that device for that very purpose, albeit incorrectly and negligently. But my point is. Whether I'm fully satisfied with that distinction, I think the city will find out when it's up for argument. My point is that looking at the case analysis and whether 201 or 304 is raised requires an analysis of what argument was made. Here, they could have raised 201 by arguing that the initial system was the problem. But we're saying the preemption system in and of itself is what created this hazard. I would also point the court to 11-304, which requires that they regulate traffic once they improve the intersection. It requires that they regulate, warn, and guide traffic once they improve that intersection. And to say that this green light did not regulate and guide him toward the track when the train was approaching is to ignore the function of a green light. It's what they in Snyder recognized dotted lines to do. They direct, guide, and authorize traffic to do certain things. That's no different than a green light. It's regulating traffic on the part of the city. And to regulate traffic toward a hazard is negligent conduct. There were other issues that were raised in our brief, Your Honor. You mentioned where did the decedent work. He worked for the city of Chicago. However, the duties owed by the. That's not what my question was about. I was interested in the department. But it has no bearing, really. We're not concerned about that argument. Okay. And the other issues that were raised, I'm happy to address any of those that the court has questions about. I think it's all on, the ball game is on that one. Respectfully, we move that this honorable court reverse the trial court and reinstate the jury's verdict. Thank you.  Section 3104 of the Tort Immunity Act immunizes the city from any claims of negligence stemming from the failure to initially install a traffic control device. The Illinois Supreme Court has made clear that a plaintiff cannot avoid this immunity simply by pointing to some other traffic control device that was already in place at the intersection. As a result, plaintiffs' claims that the city failed to install an advanced warning sign or some sort of turn prohibition at 111th and Marshfield are barred. Moreover, Don't you encounter some real trouble in the judge case? I think you could coast with Kirkham on that statement. But can you with Judge? I don't think Judge presents any problems. Judge talks about hazards, talks about the fact that all they had to do was follow the manual, and talks about the fact that there was a faulty system in place. And there is a system. The reason that Judge distinguishes the facts in that case from Kirkham? Did you think that Justice Freeman and Judge was leading a retreat from Justice Eichel and Kirkham? No. I think the line here that needs to be drawn and what the court is thoughtfully considering here today is at what point do you have an allegation of a system which would fall under West v. Kirkham and at what point do you have a single unitary traffic control device which falls under Judge? And I think Judge does an excellent job of painting that line, no pun intended, because it refers to a single traffic control device that was an issue and that was the center line on running down the interstate. Whereas in West you had multiple traffic control devices including a traffic signal. Well, there was a dissent in Judge that made the argument, Justice Cook, made the argument that it should be no different than if there was no broken line, because if there was no broken line, there would just be a yellow line, then the critique would be a failure to install. And so when you have the broken line, it's no better than if you had just the solid yellow line in which event you would then have a clear 304 immunity. And Justice Freeman kind of smiles at that. I think in either situation in Judge it's still a single traffic control device, that being the center line on the interstate. Here we have a traffic light that's already in place. We have a preemption sequence that's used to control the direction or the movement of east-west traffic. And what they want is something for southbound traffic, which is a completely separate device, an advance warning sign or some sort of a turn prohibition. What about the fact that if they formulate the plans and that that constitutes initial installation and then the failure to complete the installation is now a follow-up rather than an initial failure? I think there's at least two distinctions I'd make here. First, whether or not you make an initial decision to install something is a 2201 argument. That's the criteria for discretionary versus ministerial. Here, initial installation is 3104 and there's no case law linking those two concepts together. Additionally, I would point out that the city made a conscious decision not to install a turn prohibition for southbound. So it wasn't the fact that we made a decision and executed it wrong. We did exactly what we intended to do at this intersection. And it functioned precisely how we wanted it to. It kept east-west traffic. Well, the argument that plaintiff is making is that the installation of this system created a hazard to people by telling motorists they can do on the green light whatever it is they normally do on a green light, which includes right turns. Respectfully, the evidence of trial indicated there was no difference with the system in place. It didn't warn the traffic, but it also didn't create any sort of hazard. You could always make a right-hand turn when you had a red, yellow, or green light. But if you put in such a system that allowed that, would that be something that puts the public at hazard? No. If you put such a system in that if you make a right turn, you may very well be heading across a track that has a 60-mile-an-hour train on it? With or without the system, a southbound motorist could always make a right turn.  Supposing, hypothetically, you would have an ordinary street with an ordinary stoplight, a green light. Supposing you would dig an excavation by the side of the road that wasn't visible from the road so that the ordinary stop sign at that point would run the risk of falling off a cliff because of the excavation hidden from view, but not in any sense accommodated by the traffic signals. Are you still saying it's no different? There certainly is a duty, is there not, on the part of the city to have alerted the motorist of the hazard. The question now is how do we characterize the breach of that duty for purposes of the immunity statute? If the allegation of negligence is that the city installed a cliff, 3104 doesn't help us. But if the allegation of negligence is that the city failed to install a traffic control device to warn traffic about a cliff, then we're immune. Here, the hazard was the train, the Metro train. We didn't install one Metro train. The allegation here is that we failed to warn southbound motorists that when they turn right there's a train track there. Now supposing these traffic lights were not on that street before. Supposing it was a new installation installed after that hazard that I described in my hypothetical was created. At that point, can you still maintain that the city would be immune for failure of the initial installation if it installs a stop and go system which now actively invites movement without adding to that system a component that would alert the motorist of the hazard in the event he moves in one of the directions authorized by the device? Yes, and my answer for that is twofold. First, because prohibiting a right-hand turn or whatever direction it is in your hypothetical is a different device than a stop and go traffic sign. So it just boils down to the hardware, then, as far as you're concerned. I would add a second layer. One, I think it is certainly the hardware. These are just separate devices. West v. Kirkham makes clear you can't lump them together to get around 3104. And I think even if, although violation of the MUTCD isn't relevant towards immunity, if you look at the MUTCD, all these devices are covered under different sections. Nobody, while they relate to one another incidentally, they're never described as being the same control device. Well, why wouldn't my second example in my hypothetical, the installation of the traffic device after the creation of the hazard, at that point be analogous to the broken yellow line on the roadway? Because with the broken yellow line, traffic relied upon that. It made it dangerous because it signaled to traffic that they could pass when they didn't have a clear view of oncoming traffic. Well, wouldn't that apply here, too? No. Since there is a green light that invites movement through the interception or collateral to it. No, because the installation of the light doesn't change what traffic's allowed to do there. Without a light, traffic can turn right. With a light, traffic can turn right. And the testimony, both by plaintiff's own expert witness and the city engineer. Except that when you have a good traffic signal, it becomes not only available, but certified as kosher. Let me give you another example. Let's say you've got a green light and you want to turn right, but there's a pedestrian in the intersection. The green light doesn't give you license to run over the pedestrian. You have to stop and let the pedestrian, because they have the right of way. Having a green light doesn't... I don't know. If there is a new pedestrian crossing obscured from view, your example wouldn't pass. If it's within view, that's another story. But here we're talking about a hidden hazard. I don't think it makes a difference. The motorist always... Having a green light doesn't tell a motorist that there's nothing else going on. The motorist always has to be on lookout for what's going on around him or herself. Here I would also point out that both plaintiff's own expert witness and the city engineers testified that motorists wouldn't be aware there was a preemption sequence. They wouldn't necessarily be aware there was even a preemption sequence installed. All they would see is red, yellow, and green lights. There wasn't some sign saying, hey, by the way, we're changing the regulation of this intersection to accommodate east-west traffic and the approachment of a train. There wasn't anything here in particular like the center line and judge that would have alerted motorists that any particular regulation had taken place to accommodate a train. I would also point out that under numerous cases, although West discusses explicitly why you can't use the presence of a system to get around 3104, almost every other case applying 3104 that we cite deals with an intersection that already had some sort of regulation in place but nevertheless found 3104 applied. Gresham v. Kirby would be Grays Lake. The Mattoon were all cases where the intersection had stop signs for two directions of traffic, but not all four. Robinson v. Atkinson to Beacon-Santa Fe Railway, that was one involving an advance warning sign, but they already had a regulation in place on crosswalks warning of the railroad track. They still found 3104 applied. Ramirez v. Village of River Grove, there was a speed sign in place telling traffic how fast they could go. Found 3104 applied for failure to post a reduced speed sign in addition. And Newsom v. Thompson, the city modified the street to divert traffic only to one side of the road. With all due deference, these are all appellate court cases that may very well have preceded judge. Yes. That is true. And judge, I think, is distinguishable because the court was careful to point out, and I'm happy to quote directly from the language on the final page of judge, they discuss how it intersects with West. And they say, first, this is not a case where a creative plaintiff circumvents 3104 by pointing to some other traffic control device. Rather, the county's mistake in the present case involves the erroneous placement of one traffic signal, the center line on Galena Road. So that, I think, is where we get the distinction in judge, is because it's dealing only with the center line on the road and not any other system that you could point to. And the court is careful to make that distinction. I think it leads West to the past. Well, here we don't really know when the traffic light was installed. But do we? We don't have a record. In our case, the system was designed in 93 and installed in 94. We don't know what was there. No, what the preemption system was. But when was the traffic light installed? Right. There's no record as to what was regulating the intersection 3104. If the traffic light were installed after the hazard was created, I think at that point the broken yellow line and the installation of the traffic light would have very distinct points of analogy. Respectfully, we would disagree with that position simply because having a traffic light there didn't change what southbound traffic was permitted to do, and there was nothing about the traffic light that would have caused southbound traffic to rely on it. But wasn't that the whole purpose of adding the preemption? The purpose of the preemption was to divert east-west traffic away from the tracks, and it did that perfectly. There's no dispute at trial that we had any problem with our east-west traffic regulation. The only problem was southbound, and it was never intended to divert southbound traffic. And, in fact, in 1999 the state of Illinois issued a report saying, you guys should install a no-right-turn sign here to divert southbound traffic during the approachment of a train, and our city engineers took a look at it and sent a letter back explaining that because there were already a number of traffic control devices and signs in that intersection, the addition of one more would actually lead to degradation of motorist adherence to the signals rather than promote safety, and that's a problem that the city encounters on a fairly frequent basis. And, actually, the Illinois Supreme Court in West discusses this, too, the fact that you can always add one more sign to an intersection to make it safer. But there's no contest here that there was negligence on the part of the city. So, I mean, this is all smoke, talking about whether it would have been the right thing to do or not, because no one is disputing the fact that the failure to install a control device to provide advance warning was negligent. Correct. We don't dispute negligence, but it is relevant to whether or not we're talking about a system malfunctioning or just another device that plaintiffs wanted that we had already decided we didn't want to put in. Negligent. In addition, as Your Honor already noted, I would point out that plaintiffs' main cases here, Snyder and Lococo, deal exclusively with 2201, which is discretionary ministerial distinction, and the Illinois Supreme Court in Epstein made clear that that distinction doesn't apply to 3104. So while these cases might tell us a lot about discretionary immunity, they don't give us any insight on what it means to initially install something under 3104. And as we discussed, Judge is the one case they cite that does discuss 3104, and the city would distinguish that case on the basis that this center line was a unitary device. But the case goes way beyond that particular element in describing the, in its attempt to formulate the rule, and it seems to be going beyond Kirkham. Although it mentions Kirkham at the beginning. It mentions Kirkham at the beginning. But it's an attempt to retreat, isn't it? I would disagree. I think that they draw the distinction, as we've discussed, between the single line and multi-device system. The other thing I wanted to point out quickly on Judge is that it distinguishes West for two reasons. The first is a unitary device versus a system. But the second thing it mentions is a discussion that occurs in West about giving city traffic planners the freedom to weigh competing interests when they decide whether or not to place a sign. And that gets back to, in Judge, the court came to the conclusion that the failure to adhere to the MUTCD was simple negligence. Whereas here, again, as I discussed, that was actually a conscious decision on the part of the city weighing the competing interests precisely as they prescribe now both in West and in Judge. So on that second basis, I would say that Judge comes out in our favor. This morning, I'd also like to address the statute of repose and the Workers' Compensation Act. Just one point incidentally. Here, it's not simply negligence. It's in breach of the statute because the statute directs the city to follow the manual. The manual requires a warning device. Correct. This analysis gets a little bit messy. As the city pointed out in our briefs, whether or not we adhere to the MUTCD doesn't apply to 3104. But there is a discussion at the very end of Judge where they're distinguishing West. And I read the first part to you about the one traffic signal. The second part says, in the present case, the county's failure to correct the erroneous traffic control marking was not a result of the county's balancing of a host of competing interests, among them safety, convenience, and cost. And there they're quoting West. We're not interested in the other two arguments. Okay. We already kind of made our minds up on those. If there's no further questions then, because all the plaintiff's theories of negligence stem from a failure to initially install some sort of traffic control device, the city's position is that it's immune under Section 3104 of the Tort Immunity Act. In addition, in the alternative, the claims are barred under the construction statute of repose and the Workers' Compensation Act. For these reasons, we urge the court to affirm. Thank you. Thank you. Let me begin by just correcting a statement made by counsel. I tried this case, and the evidence in the case was absolutely that this preemption system was supposed to keep vehicles away from the tracks. It was not limited to east and westbound traffic. It was controlling traffic in all directions, including that of Mr. Sexton going southbound. In fact, Mr. Houghton, the city's long-term employee, testified that what he was asked, question, preemption systems are warning devices at intersections that interact with railroad crossings. Answer, to clear the corner. Correct, to clear the tracks. Question, did you say to clear the corner? Answer, well, yes, to clear. Set the corner up to clear the tracks and make it safe. Question, the goal of the preemption system is supposed to be to clear the distance from the corner to the track to keep vehicles away. Correct. Answer, correct. And when you allow vehicles to make right turns on grains and red, they can go up to the tracks. Correct. Answer, they can. So that preemption system, admittedly by the city, was supposed to keep Mr. Sexton away. Not a warning sign that wasn't in place. The preemption system that was in place was designed to keep vehicles away. This system did not do that. It invited him toward the tracks. And I would direct the court to a quote from the judge case. In that case, as we've discussed, the Supreme Court held that the provision of a dashed yellow line quote, gave the erroneous traffic indication and caused the accident. Further, the market... Of course, if you look at these appellate court cases, before you look at judge, what you're saying will not carry the day. Robinson involved precisely the same omission. And it was considered enough to trigger a 304 immunity, notwithstanding the fact that there were already other components in place which were operating without the one protective device that would have avoided the occurrence. So you have that. The distinction, though, Your Honor, respectfully, is the same as in West. The preemption system was in place. I'm not saying they should have put... Ramirez is likewise in a similar situation. And Ramirez was Tom Hoffman's, Justice Hoffman's decision, and it involved a single component that was missing out of the so-called system. So, you know, you're navigating through Rocky Shoals here, getting past these appellate court cases that seem to be satisfied that the omission of a single component is sufficient to trigger 304A immunity. Your Honor, the distinction again, though, is the single component analogy in those cases are independently functioning components. This is a preemption system that has a specific purpose of keeping vehicles away. And it does not do that. It directs them toward. It's no different than the dotted line in Snyder. It's no different. It's guiding them. I'm sorry, in Judge. It's instructing traffickers what to do, and that instruction creates the hazard by guiding him toward an approaching train. The preemption system specifically did that. To suggest that this is just a green light is to ignore the fact that a normal green light does not have an approaching train. A preempted green light... But it's not the installation of the green light that constitutes the negligence here. It's the failure to supplement that installation with a warning device. Respectfully noted, Your Honor. If it was just a green light, then it would have no... If there was no light at all, the hazard would remain virtually the same. Because under the, so to speak, the common law, you could make right turns, left turns at your option. And so the green light in that sense only regulated the timing of those directions in which the motorist was able to travel. But, Your Honor, respectfully, I think the... It is confusing when you talk about the fact that a green light can allow... No, it's the accoutrements to the green light that constitute the basis of the negligence claim here, and also becomes the focus of the immunity. If you're making a... certain fashion when a hazard is known to be approaching. The reason that they require that you prohibit a right turn is because that preemption system recognizes that that's a hazard that won't be appreciated by the person being regulated by the green light. They aren't appreciating a hazard. So they're saying you have to give them something to appreciate because this green light is creating a hazard that puts them in danger. So you have to do something else. If you do nothing else, you still have the green light putting you in place of a hazard. But if you don't have a green light, you still have the same hazard. That's the point. No. If the lights go through a normal sequence, you may have a red, you may have a... But if you don't have any light, just a plain uncovered intersection... Then the city's not... You have the same hazards. But the city has not undertaken any action to improve the intersection. Once they improve it and install something... You mean there's an affirmative rule that defeats the immunity? Absolutely. I thought that Kirkham said that that's not going to work. Snyder, which came after the West v. Kirkham case, specifically says it does. And I'll quote it, Your Honor. Ordinary versus ministerial is the pivotal factor in Snyder. But what they say in Snyder makes it ministerial is whether it's controlled by the MUTCD. And that's what makes it ministerial. But you don't have that issue here again. I'm going around the block for the fifth time, so I won't anymore. Sure. The judge court, and I'll close with this. The judge court cites the Snyder case, and I'll quote it. It says, Although a governmental agency has discretion in determining whether to perform a public work or make an improvement, once the decision to perform the work is made, it must be done with reasonable care and in a non-negligent manner. To place a regulatory device that is activated when a train is approaching is no different than to regulate traffic to, as they did in Judge, to pass. In fact, that was cited as a grounds in Judge for holding the municipality liable. It's no different here. And we can't ignore the fact that this preemption system was regulating traffic. The unrebutted testimony at trial was that it regulated traffic. That it was supposed to prevent traffic from encountering the track, but in fact this caused him to encounter the track and the train. But you also have the problem, in addition to anything else, of an incomplete record here, because it doesn't tell us when the traffic light was installed. As opposed to the yellow light, the yellow dotted line, we know that that was installed after the hazard was imposed. We have a record that establishes that the preemption system is what was added. Yeah, but we don't know when this traffic light was installed. But, Your Honor, if it's added to an existing system, it's added. Because the problem here is that the preemption system, if the green light was already there, didn't lock into the traffic light so as to provide further, more refined regulation. But that's exactly what preemption does. Further, more refined regulation. That's the unrebutted testimony admitted by the city. It provides further regulation of traffic when a train is approaching. It is not activated when a train is not approaching. Only when a train is approaching. So the question is whether that's an initial installation, a failure of an initial installation. The preemption system was in place, though. So how could it be an initial installation? Because the additional refinements are additional installations. Well, the testimony is that at the time that they, that the same provisions were in place at the time. That they were supposed to prohibit right turns. Finally, Your Honor, with regard to the MUTCD, council suggested that they were separate. And I just will quote this as I close. It states at 8B06, which is cited in our brief, turn restrictions during preemption. At a signalized intersection that is located within 60 meters or 200 feet of a highway railway crossing, measured from the edge of the track to the edge of the roadway, where the intersection traffic control signals are preempted by the approach of a train, all existing turning movements toward the highway railroad crossing should be prohibited during the signal preemption sequences. It's a requirement when you have preemption to prohibit it. It's, they install the preemption. A requirement that is immunized by 305. Prohibiting movement is what is required. It doesn't say you have to do that by a sign. You can prohibit it by an officer standing there. You can prohibit it in any number of ways, but you must prohibit it. They want to make it out to be by placement of a sign. That's merely one option and way. In fact, it's called option in MUTCD. A blankout or changeable sign is an option. And they give you options. You need not put a sign, but you have to prohibit if you preempt. That's kind of interesting that you didn't argue it in your brief, did you? I did. You could have put a man in place there. I did. I argued in my brief that the placement of a sign was an option for prohibiting. But you didn't suggest. I didn't do it very well, Your Honor. But I don't know that that would make a difference. If you preempt. The nature of preemption, the reason it's required is that it's recognized that your preemption system will create a hazard if you don't prohibit turns toward the track. So you can prohibit them in any number of ways, a sign or otherwise, but you have to prohibit them with preemption. And their system did not prohibit. It created a hazard that it did nothing to address. Respectfully, for those reasons, Your Honor, we seek that the trial court's order vacating the jury's verdict be reversed and the jury's verdict reinstated. Thank you for your time, Your Honor. Thank you.